UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
—————————————————————

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

TYSHAWN SIMMONS,

             Defendant.

—————————————————————

DECISION & ORDER and
REPORT & RECOMMENDATION

13-CR-6025CJS

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated September 12, 2013, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 34).

On September 9, 2014, the grand jury returned a third superseding indictment against Tyshawn Simmons ("Simmons"), Marquis McMillian ("McMillian"), Franklin Brock, Jr. ("Brock"), Melvin Hill ("Hill"), Franklin Brock, Sr. ("Brock, Sr."), Patrick Christner ("Christner"), Tina McDonald ("McDonald"), and Ciarra Crane ("Crane").  (Docket # 362).  The first count of the ten-count third superseding indictment charges all defendants, along with Tashaka Mitchum, Schmillion Weaver, and Devin Allen-Furtick, with conspiring from January 2006 through April 2013 to possess with the intent to distribute and to distribute heroin, cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. § 846.  (*Id.*).  The second count charges Simmons, McMillian, McDonald, and Brock with possession of firearms in furtherance of the drug conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2.  (*Id.*).

The third count charges Simmons, McMillian, and Brock with attempting to kill an individual in retaliation for providing information to law enforcement about a federal offense on or about June 5, 2012, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(B) and 2.  (*Id.*).  The fourth count charges Simmons, McMillian, and Brock with using, carrying, and discharging a firearm in furtherance of the crime alleged in the third count, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.  (*Id.*).

The fifth count charges Simmons and McMillian with intimidating a witness with the intent to hinder, delay or prevent the witness from communicating information to law enforcement about a federal offense on or about June 9, 2012, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(3)(B) and 2.  (*Id.*).  The sixth count charges Simmons and McMillian with using, carrying, and discharging a firearm in furtherance of the crime alleged in the fifth count, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.  (*Id.*).  The seventh and eighth counts of the indictment charge Simmons and Hill with possession with intent to distribute controlled substances – marijuana and cocaine base, respectively, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2.

The ninth count charges Simmons with intentional murder while engaged in a narcotics conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.  (*Id.*).  Finally, the tenth count of the indictment charges Simmons with possession and discharge of a firearm in furtherance of the crimes alleged in first and ninth counts of the indictment, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.  (*Id.*).

Currently pending before the Court for report and recommendation are Simmons's motions to suppress statements, tangible evidence, identification testimony, inmate

2

telephone recordings and inmate correspondence.[1]  (Docket ## 277, 304, 400, 401).  Also

pending before this Court are motions by Simmons for a bill of particulars and for disclosure of

electronic recordings.  (Docket ## 277 at ¶¶ 82-96, 111-26; 401 at ¶¶ 15-18).  For the reasons

discussed below, I deny Simmons's motion for a bill of particulars and his request for disclosure

of electronic recordings, and I recommend that the district court deny Simmons's motions to

suppress statements, tangible evidence, identifications, inmate telephone recordings and inmate

correspondence.

## FACTUAL BACKGROUND

### I.   Encounters with Simmons

This Court conducted an evidentiary hearing on February 25, 2015, March 4,

2015, and May 4, 2015, concerning the circumstances surrounding three traffic stops of vehicles

occupied by Simmons and four other encounters with Simmons that occurred in June and July of

---

[1]  Simmons filed several omnibus motions seeking other forms of relief including, *inter alia*, *Brady* material, discovery, Rule 404(b) and 609 materials, *Jencks* material, disclosure of experts, and leave to file additional motions.  (Docket ## 277, 304, 400, 401).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on March 3, 2014 and February 5, 2015.  (Docket ## 302, 303, 404, 405).

In several of his submissions, Simmons sought to suppress evidence seized during the execution of several search warrants, including search warrants for 97 Rauber Street and 480 Ravenwood Avenue.  (Docket ## 277 at ¶¶ 65-67; 400 at ¶¶ 30-32).  Additionally, Simmons has submitted affidavits regarding his connection to those locations.  (Docket ## 400-1 at ¶ 5; 410 at ¶¶ 3-4).  Simmons's submissions also reserved the right to seek suppression of evidence seized pursuant to a wiretap warrant.  (Docket # 277 at ¶¶ 5-13).  During oral argument on Simmons's motions on February 5, 2015, the Court informed Simmons that his submissions did not sufficiently provide the basis for a challenge to any wiretaps or search warrants and, accordingly, the Court did not interpret any of Simmons's submissions to raise those challenges.  (Docket ## 405, 432 at 10-11, 19-20).  The Court informed Simmons that if he wished to challenge any of the wiretaps or search warrants, he was required to file a motion seeking leave to raise those challenges.  (Docket # 432 at 10-11, 19-20).  During subsequent proceedings, Simmons's counsel mentioned a probable cause challenge to the search warrant for 480 Ravenwood (Docket #414 at 86-87), although Simmons never filed a motion seeking leave to challenge that warrant or any other search or wiretap warrants.  Accordingly, those issues are not pending before the Court.

2012 and February 2013.[2]  (Docket ## 409, 416).  During the hearing, the government offered

testimony from Investigator Jennifer Morales ("Morales"), Officer Kenneth Coniglio

("Coniglio"), Officer Brandon Ince ("Ince"), Officer Tim Thomas ("Thomas"), Sergeant

Timothy Pancoe ("Pancoe") and Officer Kenneth Richardson ("Richardson"), all employed by

the Rochester Police Department ("RPD"), and Drug Enforcement Administration ("DEA")

Special Agent James Schmitz ("Schmitz").  (Tr. A 4-5, 23-24, 51; Tr. B 9-10, 18, 27; Tr. C 127).

A.      **June 8, 2012 Traffic Stop**

Coniglio testified that he had been employed by the RPD for approximately

sixteen years.  (Tr. A 24).  On June 8, 2012, Coniglio was on duty at approximately 9:00 p.m.

and was patrolling in a marked vehicle with his window down, traveling southbound on

Reynolds Street in the City of Rochester.  (Tr. A 25, 34).  Coniglio's partner, Officer Hickey,

was with him in his vehicle.  (Tr. A 33).  Coniglio testified that as he drove by a Nissan Murano

parked on the east side of Reynolds Street, he noticed an "overpowering smell of burning

marijuana" coming from the parked vehicle.  (Tr. A 25-26).  Coniglio testified that he was

familiar with the scent of burning marijuana through his experience as a police officer.  (Tr. A

26).

According to Coniglio, an individual was leaning into the driver's side window,

speaking to the occupants of the vehicle.  (Tr. A 27).  Coniglio turned his vehicle around and

pulled up behind the parked vehicle.  (Tr. A 26-27).  Prior to approaching the vehicle, Coniglio

did not know the identities of the vehicle's occupants.  (Tr. A 31).  Coniglio and his partner

approached the parked vehicle and identified the occupants as Simmons and McMillian.  (Tr. A

28).  Simmons was in the driver's seat, and McMillian was in the passenger seat.  (Tr. A 36).

---

[2]   The transcript of the February 25, 2015 hearing shall be referred to as "Tr. A __," the transcript of the March 4, 2015 hearing shall be referred to as "Tr. B __," and the transcript of the May 4, 2015 hearing shall be referred to as "Tr. C __."  (Docket ## 414, 431, 433).

Coniglio testified that he recognized Simmons and McMillian, knew of their suspected involvement in criminal activities, and was aware that they had a "propensity for violence." (Tr. A 30-31).  Coniglio testified that the individual observed leaning into the vehicle was also identified.  (Tr. A 28).  Based upon the scent of marijuana, the officers asked them to step out of the vehicle.  (Tr. A 28, 35).  All three individuals were frisked and secured in patrol vehicles, and the vehicle was searched for marijuana.  (Tr. A 28-29, 37-38).

During the search of the vehicle, Coniglio discovered a notebook folded in half between the center console and the seat.  (Tr. A 29, 42-43).  Coniglio removed the notebook to see if there was marijuana hidden in it.  (Tr. A 29-30, 38-39).  Without turning any pages of the notebook, Coniglio observed handwritten notations of several vehicle descriptions, some with corresponding license plate numbers, on the open page.  (Tr. A 30, 38-39).  According to Coniglio, he believed that the vehicle descriptions and license plate numbers were likely associated with potential targets of violence by Simmons and McMillian or with their surveillance activities.  (Tr. A 30-32, 40).  Coniglio copied the information into a Field Interview Form and returned the notebook to the car.  (Tr. A 31-32, 42, 44-46; Government's Exhibit ("G. Ex.") 4).  Coniglio testified that he did not have the legal authority to seize the notebook. (Tr. A 32).  Coniglio testified that he did not discover any marijuana in the vehicle, and no other evidence or contraband was seized.  (Tr. A 29, 32, 42).  After the vehicle had been searched, Simmons and McMillian were released; the entire encounter lasted approximately twenty minutes.  (Tr. A 32, 48).

## B.  June 19, 2012 Encounter

Pancoe testified that he has been employed by the RPD for approximately six and one-half years.  (Tr. B 18).  On June 19, 2012 at approximately 5:00 p.m., Pancoe and his partner

Officer Thomas were dispatched to 112 Durnan Street to investigate a report of men smoking marijuana. (Tr. B 19, 21). Pancoe testified that when they arrived they observed approximately seven men on or near the porch of 112 Durnan Street. (Tr. B 19, 24). According to Pancoe, he recognized some of the individuals, but did not recognize others. (Tr. B 19-20). Pancoe and Thomas requested that all of the individuals remain in the area while they asked the individuals whom they did not recognize for identification. (Tr. B 20-22). According to Pancoe, he recognized Simmons, although he may have asked him for his date of birth and address. (Tr. B 20-23). Pancoe testified that they did not make any arrests or seize any evidence during the encounter, which lasted approximately five minutes. (Tr. B 20, 24-25).

### C. June 28, 2012 Traffic Stops

Richardson testified that he has been employed by the RPD for approximately fifteen years and was on duty at approximately 4:12 p.m. on June 28, 2012. (Tr. B. 28). At that time, Richardson was driving a marked patrol vehicle on Bartlett Street with his windows down. (Tr. B 28-29). According to Richardson, as he passed a stationary vehicle on his left, he noticed the smell of burning marijuana, which he had been trained to detect. (Tr. B 29-30, 32, 38). Richardson made a U-turn, activated his lights, and pulled in behind the vehicle. (Tr. B 30). Richardson approached the driver's side of the vehicle, and his partner approached the passenger side. (Tr. B 30, 34). Neither officer drew his weapon. (Tr. B 31). According to Richardson, the driver of the vehicle was identified as Simmons, and the passenger was identified with the last name Brock. (Tr. B 30, 35).

Because he smelled a strong odor of marijuana, Richardson immediately asked Simmons if he had been smoking marijuana, and Simmons responded affirmatively. (Tr. B 31, 33). Richardson asked whether there were any additional marijuana or weapons in the vehicle,

and Simmons replied that there were not.  (Tr. B 31).  Based upon the smell of the marijuana,

Richardson requested that the occupants exit the vehicle, and he pat-frisked Simmons and placed

him in his patrol vehicle.  (Tr. B 31-32, 39).  Brock was seated on the curb.  (Tr. B 32, 35).

Richardson searched the vehicle, but located nothing other than marijuana residue.  (Tr. B 32).

Nothing was seized, and the occupants were released.  (Tr. B 32, 35).  The entire encounter

lasted approximately five to ten minutes.  (Tr. B 38).

       Ince testified that he has been employed by the RPD for approximately nine years.

(Tr. A 51-52).  On June 28, 2012, Ince was on patrol in the City of Rochester with his partner

Officer Kent.  (Tr. A 61-62).  At approximately 9:31 p.m., he observed a Dodge vehicle turn at

an intersection without providing sufficient notice, in violation of the provision of New York

Vehicle and Traffic Law that requires a driver to signal an intention to turn at least one hundred

feet prior to executing a turn.  (Tr. A 62-63).  After observing the violation, Ince stopped the

vehicle on Clinton Avenue.  (Tr. A 63-64).  Ince did not know who was in the car.  (Tr. A 66).

       Ince and his partner approached the car and observed two individuals,

subsequently identified as Simmons and Brock.  (Tr. A 64-65).  Ince ran a records check and

learned that neither Simmons nor Brock had any outstanding warrants.  (Tr. A 65).  Simmons

and Brock were released, and no citations were issued.  (Tr. A 65).

    **D.**    **July 12, 2012 Arrest of Simmons**

       Thomas testified that he had been employed by the RPD for approximately nine

years.  (Tr. B 9-10).  At approximately 4:40 p.m. on July 12, 2012, Thomas and his partner

Pancoe were driving in a marked patrol vehicle on Durnan Street in the City of Rochester.  (Tr. B

10-11).  According to Thomas, they exited the vehicle in the area of 112 Durnan Street.  (Tr. B

11).  Thomas testified that they were in the area of that location because they were looking for a

wanted suspect and video surveillance from earlier that day had revealed the presence of a large

group of individuals at 112 Durnan Street.  (Tr. B 14).

According to Thomas, as he exited his patrol vehicle he immediately smelled a

"strong odor of burning marijuana" coming from the front porch of 112 Durnan Street.  (Tr. B

11).  He observed Simmons sitting on the front porch holding what appeared to be a lit marijuana

cigar in one of his hands.  (Tr. B 12-13).  According to Thomas, once Simmons observed him,

Simmons stood and threw the cigar onto the ground.  (Tr. B 13).  As Thomas approached

Simmons, he observed a dime bag of marijuana fall from Simmons's lap as Simmons began to

stand.  (Tr. B 13, 16).  Simmons stated, "All I'm doing is smoking some marijuana."  (Tr. B 13).

Thomas testified that Simmons's statement was not in response to police questioning.  (Tr. B

13).  Simmons was taken into custody, and the marijuana blunt and baggie were seized as

evidence.  (Tr. B 13, 16-17).

### E.      February 7, 2013 Arrest of Simmons

Morales testified that she has been employed by the RPD for approximately sixteen

years.  (Tr. A 5).  On February 7, 2013, Morales participated in the execution of a search warrant

for 480 Ravenwood Avenue, Rochester, New York, as well as the execution of an arrest warrant

for Simmons at that same location.  (Tr. A 5; G. Exs. 1 and 2).  Morales testified that Simmons

and an individual named Shakita Hill were present in the residence at the time of the execution

of the warrants.  (Tr. A 7).  Simmons was located upstairs, where he was taken into custody.

(Tr. A 12-13).  At that point, Morales informed Simmons that she had a federal warrant for his

arrest and that the officers would be executing a search warrant at the house.  (Tr. A 12).

Simmons was handcuffed and seated on the stairs in the house, and Shakita Hill was placed in

the living room area, within verbal communication range to Simmons.  (Tr. A 7, 10).

According to Morales, as she was walking up and down the stairs, she overheard Simmons make several statements during the search of the residence. (Tr. A 8, 14). The first statement that she overheard Simmons make was that he never sold drugs. (Tr. A 8, 11). Morales could not recall whether other officers were in the vicinity of Simmons when he made that statement. (Tr. A 14).

Later, when she was on the stairs again, Morales overheard Simmons say, in sum and substance, "I don't know why you keep searching my house." (Tr. A 15). Morales believed the comment was directed at her. (Tr. A 15). Toward the end of the search, within Simmons's hearing range, Morales instructed the uniformed officers to ensure that a particular vehicle was towed from the location. (Tr. A 15-17). According to Morales, she told the officers that she had a search warrant for the vehicle and that the vehicle should be towed to the Public Safety Building if it had not already been towed. (Tr. A 19-20). After she issued those instructions, Simmons, referring to Shakita Hill, stated, "It's her car." (Tr. A 17). Morales testified that none of the officers questioned or made any statements directed to Simmons that prompted his statements. (Tr. A 8).

Ince testified that he also participated in the execution of the search warrant and was tasked with monitoring Simmons and Shakita Hill during the search of the residence. (Tr. A 52-53). At some point, he overheard Simmons state, "I don't do anything, I just fight and breed dogs for my money." (Tr. A 54, 57). According to Ince, Simmons also repeatedly asked Shakita Hill whether she remembered information that he had written to her in "some letters." (Tr. A 55). Ince testified that Simmons's statements were not made in response to questioning or comments by him or any other officers at the scene. (Tr. A 55-56).

### F.    February 12, 2013 Escort of Simmons

Schmitz testified that he has been employed by the DEA for approximately ten years.  (Tr. C 128).  On February 12, 2013, Schmitz, along with another DEA agent, assisted three United States Marshals Service employees in escorting Simmons and several of his co-defendants to and from a holding area into the courtroom for a court appearance.  (Tr. C 128-30).  As the defendants were being escorted back to the holding area, they walked past several family members, prompting communications between the family members and the defendants.  (Tr. C 134-36).  According to Schmitz, the defendants were instructed to stop talking and were verbally directed toward the holding area.  (Tr. C 134-36).

Schmitz testified that as the group entered the hallway leading to the holding area, Simmons stated, "That was a circus they put on in there[;] that prosecutor and the agents need their ass beat."  (Tr. C 130).  According to Schmitz, Simmons did not appear to direct the statement to anyone in particular, and the statement did not respond to any comments directed toward him.  (Tr. C 130-31, 133).  Schmitz did not recall any statements made by any of the agents to the defendants other than general directions to cease talking and to move toward the holding area.  (Tr. C 135, 137).  According to Schmitz, neither he nor any of the other agents responded directly to Simmons's statement.  (Tr. C 137).

### II.    Identification Procedures

This Court conducted an evidentiary hearing on March 4, 2015 concerning the circumstances surrounding three photographic identification procedures.  (Docket # 416). During the hearing, the government offered testimony from RPD Investigator Joseph Briganti ("Briganti").  (Tr. B 44).

A.      **September 11, 2012 Identification**

      Briganti testified that he has been employed by the RPD for approximately eighteen years and was employed as a police officer by the City of Niagara Falls for approximately two years prior to his employment with RPD.  (Tr. B 44-45).  On September 11, 2012, Briganti, Morales, Investigators Swain and Hooper, and Assistant United States Attorney Rodriguez interviewed a witness for approximately two to three hours concerning the witness's knowledge about a group of individuals under investigation with whom he[3] associated with in the area of Carter and Roycroft Street.  (Tr. B 45-47, 57-58).  The interview involved discussions of all of the individuals under investigation.  (Tr. B 52-53).

      According to Briganti, the witness indicated that he had known Simmons for several years and that Simmons was a leader of the group.  (Tr. B 52-53, 60).  Simmons and his activities were discussed during the interview.  (Tr. B 58).

      Toward the end of the interview, the witness was shown approximately thirteen different photographic arrays of individuals believed to be associated with the group, including a photographic array containing a picture of Simmons.  (Tr. B 47-48, 55, G. Ex. 10).  Briganti could not recall the order in which the arrays were displayed.  (Tr. B 47, 51).

      Prior to displaying the first of the arrays, the witness was instructed to view the arrays and to indicate whether he could identify any of the individuals depicted.  (Tr. B 49).  He was instructed that if he could, he should circle the number above the photograph and write the name by which he knew the individual.  (Tr. B 49).  Briganti believed that these instructions were provided to the witness prior to the display of the first array, but were not repeated for each

---

[3] The gender of the informant was not identified at the hearing.  For ease of reference, the informant will be identified using the masculine pronoun throughout this opinion.

array.  (Tr. B 56-57).  Briganti could not recall whether the witness had ever provided a physical description of Simmons.  (Tr. B 57, 59).

Briganti testified that when the array containing Simmons's photo was displayed to the witness, the witness instantly pointed to the photograph under number three, circled the number three, and wrote "Ty" above the photograph.  (Tr. B 49, 56; G. Ex. 10).  The witness then signed the bottom of the array.  (Tr. B 49; G. Ex. 10).  According to Briganti, no one in the room indicated or suggested to the witness which photograph to select.  (Tr. B 49-50).

### B.       January 16 and 23, 2013 Identifications

On January 16, 2013, Briganti, Morales and Swain met with a witness in a conference room in the United States Attorney's Office to discuss that witness's activities with Simmons and other members of the Carter/Roycroft group.  (Tr. B 63-64, 79).  According to Briganti, the witness appeared to be very scared, and was shaking and periodically close to tears.  (Tr. B 64-65).  Briganti repeated questions several times before the witness responded.  (Tr. B 65).  According to Briganti, conversations between the witness and Simmons relating to the purchase of narcotics were recorded during the investigation.  (Tr. B 67).  During the interview on January 16, 2013, the witness was informed that she[4] had the right to an attorney and would be provided one if she could not afford to hire one.  (Tr. B 67-68).  The witness did not have an attorney during the January 16, 2013 interview.  (Tr. B. 67-68, 79).

During the interview, several photographic arrays were displayed to the witness, and Briganti was unable to recall when the array containing Simmons's photograph was displayed in the course of all the arrays.  (Tr. B 79).  Prior to displaying any of the arrays, Briganti testified that he instructed the witness that she may or may not recognize one or more of

---

[4]  The identity of the witness was not disclosed.  In any event, for ease of reference, the informant will be identified using the feminine pronoun throughout this opinion.

the individuals depicted.  (Tr. B 65, 80).  Briganti also instructed the witness that if she was able

to identify anyone, she should circle the number, and write the name by which she knew the

individual above the photograph.  (*Id.*).  Briganti then began displaying the arrays to the witness,

one after the other.  (Tr. B 80).

Briganti testified that when he displayed the array containing Simmons's

photograph, the witness first circled photograph number two and then circled photograph number

three.  (Tr. B 66; G. Ex. 11).  According to Briganti, the witness indicated that one of the circled

photographs was Simmons, but she was unable to determine which one because she could not

"see the gold teeth in his mouth."  (Tr. B 66, 81).  Briganti then asked the witness which of the

two selected photographs she believed to be Simmons, and she responded number two and

placed the word "Ty" above that photograph.  (Tr. B 66, 81).  Briganti testified that no one

indicated to the witness which photograph she should select and, other than the reference to gold

teeth, he could not recall whether she had provided a physical description of Simmons prior to

the display of the arrays.  (Tr. B 81).  According to Briganti, after she placed the word "Ty"

above the photograph, the witness indicated that she was concerned for her safety and that "if the

person found out, they would kill her."  (Tr. B 83-84).

Approximately one week later, on January 23, 2013, Briganti and Morales

contacted the witness to arrange another meeting.  (Tr. B 77-78).  The purpose of the meeting

was to arrange a controlled purchase from Simmons.  (Tr. B 68).  The witness's attorney was not

present during the meeting they had later that day.  (Tr. B 72-73).  Briganti was not aware

whether the witness had executed a proffer agreement and was not aware of any promises made

to the witness in exchange for cooperation.  (*Id.*).

During the meeting, the witness was shown another array with the same photographs in different positions and was again instructed that she may or may not recognize any of the individuals depicted and, if she did recognize any of the individuals, she should circle the number of the photograph and write the name by which she knew the depicted individual. (Tr. B 71).  According to Briganti, the witness pointed to photograph six and stated, "That's him."  (Tr. B 71).  She then circled the number six and wrote "Ty" on the photograph.  (Tr. B 71).  The witness signed the bottom of the array and then participated in a controlled buy from Simmons.  (Tr. B 71-72).  Briganti could not recall whether the witness provided a physical description of Simmons prior to the identification procedure.  (Tr. B 76).

## III.  **Inmate Telephone Calls and Correspondence**

This Court conducted an evidentiary hearing on May 4, 2015 concerning the policies and practices governing the recordings of inmate phone calls and the handling of inmate correspondence at several institutions at which Simmons was incarcerated.

### A.  **Seneca County Jail**

Sergeant Donald M. Borland ("Borland") testified that he has been employed in the corrections department of the Seneca County Sheriff's Office for approximately thirteen years.  (Tr. C 5).  In connection with his employment, he was asked to provide recordings of telephone calls made by Simmons while incarcerated in Seneca County.  (Tr. C 5).

Borland testified that Global Tel Link is the company that provides phone service for the Seneca County Sheriff's Office.  (Tr. C 11).  According to Borland, prior to making an outgoing telephone call, an inmate must enter a code, which includes an inmate-specific criminal history number.  (Tr. C 6).  Borland testified that it would be possible for an inmate to enter

14

another inmate's criminal history number in order to place a call.  (Tr. C 25).  Once the code is

entered, the inmate can place a call, which may be accepted by the recipient.  (Tr. C 6-7).  At the

initiation of the call an automated message is played, which, according to a Global Tel Link

representative with whom Borland spoke, is heard by both parties to the phone call.  (Tr. C

10-11).

> According to Borland, the automated message announces as follows:
>
> Global Tel Link. This call may be recorded or monitored.  I have a
> prepaid call from [Recorded Name], an inmate at Seneca County
> Jail, your account balance is [Monetary Amount].  If you wish to
> accept this prepaid call, dial "0" and hold; to refuse dial "5."
> Thank you.

(Tr. C 8-9; G. Exs. 21 and 22).[5]  Borland testified that the phone system was upgraded in

approximately June 2015.  (Tr. C 22).  According to Borland, he transcribed the message after

listening to it play on the previous telephone system.  (Tr. C 21-22).  Borland did not recall when

the automated message was first put in use, and he did not ask the Global Tel Link representative

whether the message had been altered at any time.  (Tr. C 23).

> In response to the request for Simmons's phone calls, Borland created a computer

folder on his desktop and named the folder "Tyshawn Simmons."  (Tr. C 14, 17).  He then

searched for recordings of Simmons's phone calls by entering Simmons's criminal history

number into a program on his computer.  (Tr. C. 15-16).  The search resulted in a list of files

containing phone calls between February 13, 2013 and May 2, 2013, the period of time that

Simmons was incarcerated in Seneca County.  (Tr. C 15-16).  Borland copied the listed files and

saved them into the folder on his desktop.  (Tr. C 12, 14-15).  He then copied the files onto a

compact disc.  (Tr. C 19-20).  Borland testified that he compared the names of the files contained

---

[5]  In Borland's typewritten transcription of his handwritten transcription of the message, he mistakenly
substituted the word "collect" for "prepaid" in the second sentence.  (*See* G. Ex. 21).

in the desktop folder with the names of the files on the compact disc to confirm that the titles

were the same.  (*Id.*).  Borland did not listen to the recordings.  (Tr. C 18-19).

During the hearing, the government played two of the recorded phone calls from

the compact disc provided by Borland.  (Tr. C 26-28).  The automated message that Borland

testified about is recited at the beginning of those two recordings.  (G. Ex. 22).

## B.      Livingston County Jail

Sergeant Jeffrey L. Hammond ("Hammond") testified that he has been employed

in the corrections department of the Livingston County Sheriff's Office for approximately

nineteen years.  (Tr. C 29-30).  According to Hammond, the Livingston County Sheriff's Office

contracts with an outside company for phone services.  (Tr. C 30).  Hammond testified that all

inmate telephone calls are recorded and maintained.  (Tr. C 30).  According to Hammond, a

message is played before every call that is heard by the inmate placing the call, as well as the

recipient of the call.  (Tr. C 31).  The message states, in relevant part, that "all calls may be

recorded or monitored."  (Tr. C 31).

Hammond also testified that all inmates receive a handbook containing the

facility's rules and regulations, which advises them that their audio communications may be

recorded.  (Tr. C 31).  According to Hammond, when each inmate is initially moved into a cell,

an officer reviews a housing inspection form and ensures that each item on the list is present in

the cell and in good condition.  (Tr. C 32).  One of the items on the form is the handbook.  (Tr. C

32).

Hammond reviewed a housing inspection form for Simmons's cell that appeared

to contain his signature.  (Tr. C 32).  Although Hammond was unable to confirm that the

signature was Simmons's, the form contained his name and his folder number, and was retrieved

16

by Hammond from Simmons's inmate folder.  (Tr. C 32-34; G. Ex. 23).  The form indicates that

a copy of the rules and regulations was in Simmons's cell when he moved in.  (Tr. C 34-35;

G. Ex. 23).  Hammond testified that he did not know whether Simmons actually read the

document.  (Tr. C 37).

Hammond testified that Simmons would have been provided the December 2012

version of the rules and regulations when he was checked into the facility.  (Tr. C 35; G. Ex. 24).

Section 9 of the General Information section of that version of the handbook provides:

> All Inmates are subject to video and Audio Monitoring in the
> facility.  All common areas of the facility will be under video and
> audio surveillance. Cell areas are subject to audio surveillance.
> Surveillance will be continuous and without warning.

(Tr. C 36; G. Ex. 24 at 3).

### C.   **Northeast Ohio Correctional Center**

Officer Sharon Lynn Piccione ("Piccione") testified that she has been employed

in the investigations section of the Northeast Ohio Correctional Center for approximately four

years.  (Tr. C 39).  She testified that in order for an inmate to place an outgoing phone call at the

facility, the inmate must first enter an inmate-specific PIN number.  (Tr. C 41, 53-54).  Piccione

testified that recorded telephone calls are identified according to those PIN numbers.  (Tr. C 41).

According to Piccione, inmates could conceivably exchange or steal each other's PIN numbers

and use them to place outgoing calls.  (Tr. C 53-54).

Piccione testified that both at the beginning and at some other point during every

phone call made by an inmate from the facility, a recorded message advises the inmate that the

phone call is being monitored and is subject to recording.  (Tr. C 40).  According to Piccione, the

call recipient also hears the message.  (Tr. C 52).  Piccione testified that the same message has

been used since she first began monitoring phone calls in 2011.  (Tr. C 53).  Piccione testified

17

that in response to a request for Simmons's phone calls while he was incarcerated at the facility, she conducted a search, approved by the warden, for recordings associated with Simmons's PIN number and copied those recordings onto a compact disc.  (Tr. C 40-41).

Piccione testified that inmates, upon admission to the facility, are provided forms informing them that their telephone calls are monitored and their correspondence is subject to review.[6]  (Tr. C 41, 45-47; G. Ex. 25).  Staff members review the forms with each inmate; the forms require a signature from the inmate indicating that he is aware that telephone calls are monitored and that his correspondence is subject to review.  (Tr. C 41-44).  According to Piccione, Simmons was admitted to the facility on four separate occasions: May 2, 2013, July 5, 2013, November 24, 2014, and January 29, 2015.  (Tr. C 59-60).  Simmons executed notification

---

[6]  With respect to telephone calls, the form provided as follows:

> Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.  An inmate's use of institutional telephones constitutes consent to this monitoring.  A properly placed phone call to an attorney is not monitored.  You must contact you [sic] unit team to request an unmonitored attorney call.

> I have read or had read to me (cross out one) the above notification on the monitoring of inmate telephone calls.  I understand that telephone calls I make from institution telephones may be monitored and recorded.

With respect to correspondence, the form provided as follows:

> The staff of each institution of Corrections Corporation of America has the authority to open all mail addressed to you before it is delivered to you. "Special Mail" (mail from the President and Vice President of the U.S., Attorneys, Members of the U.S. Congress, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons but including U.S. Attorneys), other Federal Law enforcement officers, State Attorney General, Prosecuting Attorneys, Governors, U.S. Courts, (including U.S. Probation Officers and State Courts) may be opened only in your presence to be checked for contraband.  This procedure occurs only if the sender adequately identifies himself or herself on the envelope and the front of the envelope is marked "Special Mail-Open only in the presence of the inmate."  Other mail may be opened and read by the staff.

(G. Ex. 25).

18

forms concerning the monitoring of inmate phone calls and the review of inmate correspondence upon each of those four admissions.  (Tr. C 41-43, 59-60; G. Ex. 25).

In addition to the notification forms, inmates are also provided an inmate admission and orientation handbook upon their admission to the facility.  (Tr. C 51, 56-57). Piccione did not know whether inmates sign any document acknowledging their receipt or review of the handbook.  (Tr. C 57).  Piccione testified that during Simmons's incarceration at the facility he would have been provided either the April 8, 2013 version of the handbook (G. Ex. 26) or the March 31, 2014 version of the handbook (G. Ex. 27).  (Tr. C 48, 51).

With respect to outgoing correspondence, both versions of the handbook provide as follows:

> All outgoing general correspondence is subject to being read, in part or in full, and searched for contraband before it is sent to the post office for delivery.

(Tr. C 50-51; G. Exs. 26 at 24, 27 at 25).  With respect to incoming correspondence, both versions of the handbook provide as follows:

> All incoming general correspondence is subject to being read, in part or in full, and searched for contraband before it is delivered to the inmate/resident.

(Tr. C 50-51; G. Exs. 26 at 23, 27 at 24).

**D.**   **Monroe County Jail**

Charles Facteau ("Facteau") testified that he has been employed for eighteen years by Global Tel Link, a company that contracts with the Monroe County Sheriff's Department to provide inmate phone service at the Monroe County Jail.  (Tr. C 60-61). Facteau's responsibilities as system administrator of the phone system require him to monitor the phone system, repair damaged phones, and manage recordings of inmate phone calls.  (Tr. C 61).

According to Facteau, inmates can place outgoing telephone calls from designated inmate telephones within the facility.  (Tr. C 62, 67-68).  Every telephone that is accessible to inmates has a placard above it that provides instructions for how to initiate a call, as well as a written notice in bold letters that each call is subject to monitoring and recording.  (Tr. C 62, 67).  Facteau testified that after an inmate has dialed a valid, legal phone number, the call is automatically date and time stamped.  (Tr. C 63).  Once the recipient answers the call, and if necessary accepts the charges, an automated message is played to both the recipient and the inmate stating that the call is subject to monitoring and recording.[7]  (Tr. C 64).

Facteau testified that inmates are not required to input an identifier prior to placing a phone call.  (Tr. C 64).  Thus, in order to identify phone calls made by particular inmates, Facteau must review call logs, arrest records, visitors' logs and booking data reports to identify phone numbers associated with each inmate.  (Tr. C 65).  Once he has identified the phone numbers, he then searches the system of recorded calls and gathers the calls for the associated numbers.  (*Id.*).

**E.     Yates County Jail**

Corrections Officer Anthony Hill testified that he has been employed in the corrections department of the Yates County Sheriff's Office for approximately four years.  (Tr. C 76-77).  According to Officer Hill, on September 27, 2014 Simmons requested that an envelope be given to his visitor that day during his visitation; he made the request by completing an Inmate Request Form and placing the form, along with the envelope, in the bay area of his unit.  (Tr. C 77-83).  Officer Hill took the envelope and the request form, completed the top portion of the form, and placed the form and the envelope at the booking window for approval.

---

[7]  In a sworn affidavit dated February 2014, Facteau stated that inmates also heard an automated message prior to placing a phone call.  (Tr. C 70-71).  According to Facteau, the initial automated message is no longer used, and inmates now hear the automated message only once for each call.  (Tr. C 71-73).

(Tr. C 80, 82-83).  Later that day, after visitation, Simmons asked him what had happened to the envelope.  (Tr. C 83).  Officer Hill told Simmons that he would attempt to find out and asked personnel in the booking department if they knew what happened to the envelope.  (Tr. C 83-84).  According to Officer Hill, he was unable to obtain any further information about the envelope. (Tr. C 84).

       Lieutenant Clay Rugar ("Rugar") testified that he was the administrator of the Yates County Jail and had been employed there since 1985.  (Tr. C 85).  On October 1, 2014, Rugar was approached by another corrections officer who had been sorting incoming mail. (Tr. C 86).  The officer presented Rugar with a sealed jail envelope that had the jail's return address stamped in the upper-left corner, but no outgoing address or postage.  (Tr. C 86, 92; G. Ex. 8).  The envelope had the name "Lillie Thomas" and the words "LEGAL PAPERS" handwritten on the front and a time and date stamp from the postal service on the back.  (Tr. C 87, 92-93; G. Ex. 8).  The envelope was stamped September 27, 2014.  (Tr. C 87, 100; G. Ex. 8). The officer had found the envelope while sorting the incoming mail and asked what should be done with the envelope.  (Tr. C 86).  Because the envelope had the jail's return address and a postal service stamp, Rugar assumed that the mail had been sent from the facility and then returned by the postal service.  (Tr. C 97).

       According to Rugar, he was not familiar with the name "Lillie Thomas."  (Tr. C 92-93, 97).  Although the envelope bore the words "legal papers," Rugar did not consider the envelope to contain legal papers because it was not marked with an attorney's name or the name of a government agency.  (Tr. C 94).  According to Rugar, simply writing the words "legal papers" on an envelope is insufficient to transform the contents into legal mail.  (Tr. C 94).

Rugar believed that the envelope needed to be opened in order to identify the inmate to which it should be returned.  (Tr. C 86-87).  According to Rugar, he opened the sealed envelope and skimmed the contents, which caused him to suspect that it belonged to Simmons.  (Tr. C 87, 89, 91-94).  Rugar replaced the contents into the envelope and placed the envelope in a locked box belonging to Sergeant Bailey ("Bailey"), the facility's intelligence officer, who had been in contact with other government authorities concerning Simmons.  (Tr. C 89, 91-94, 100).  Rugar was later informed that Bailey had made a copy of the contents of the envelope and returned the original envelope and its contents to Simmons.  (Tr. C 89, 91).

Rugar testified that inmates may place outgoing collect phone calls from the facility.  (Tr. C 95).  According to Rugar, all calls are recorded, and both the inmate and the call recipient are verbally advised that the call may be monitored or recorded.  (Tr. C 95-96).  Rugar testified that inmates are not required to input a PIN prior to placing a call, and the facility identifies calls from particular inmates based upon the phone number of the recipient.  (Tr. C 96).  According to Rugar, phone calls are not routinely monitored and, upon written request from other law enforcement authorities, Bailey will search for and supply recordings of particular inmate's phone calls.  (Tr. C 98-99).

Sergeant Jared Bailey ("Bailey") testified that he has been employed in the corrections bureau of the Yates County Sheriff's Office for approximately thirteen years.  (Tr. C 101).  Bailey testified that in October 2014 he discovered an envelope in his lockbox.  (Tr. C 103).  He had no prior knowledge of the envelope or why it was in his lockbox.  (Tr. C 103).  He made a copy of the envelope and its contents and provided the originals to Simmons.  (Tr. C 104, 106; G. Ex. 8).  According to Bailey, he was aware that Simmons had made an inmate request

22

concerning missing correspondence that had accidentally been sent out of the facility with the outgoing mail.  (Tr. C 111-12).

Bailey mailed the copy of the envelope and its contents to an investigator in Rochester, New York.  (Tr. C 104, 106-08).  According to Bailey, he was aware of an ongoing investigation involving Simmons and had received an email request to monitor Simmons's phone calls and correspondence.  (Tr. C 102-03, 110, 116).  Bailey testified that he had observed a list of names inside the envelope and had recognized at least two of the names.  (Tr. C 105).  Based upon his knowledge that Simmons was under investigation, he was concerned that the list of names might be a "hit list" and forwarded the copy to law enforcement in Rochester, New York. (Tr. C 110-11).

Bailey testified that he was responsible for recording and monitoring inmate phone calls.  (Tr. C 112).  Bailey initially testified that inmate phone calls are not recorded unless a request has been made for the calls of a particular inmate.  (Tr. C 112-13).  He subsequently testified that all inmate phone calls are recorded by the company that provides the telephone service for the facility.  (Tr. C 123).  Once a request is made for a particular inmate's phone calls, Bailey has the ability to extract all calls made by inmates in a particular housing unit. (Tr. C 124).  Once all of the recordings are extracted, they can be reviewed in an effort to identify phone calls relating to a particular inmate.  (Tr. C 114-15).  With respect to the request for Simmons's phone recordings, Bailey obtained all of the recordings from Simmons's housing unit and sent all of the calls to the law enforcement officer who requested Simmons's calls. (Tr. C 115-16).

Bailey testified that he believes the inmate handbooks contains written notification that inmate phone calls and correspondence are subject to monitoring and recording,

but he was not certain without reviewing the handbook. (Tr. C 113, 117-18). According to

Bailey, each inmate is provided a copy of the handbook when he enters the facility, and the

inmate signs a document acknowledging receipt of the handbook. (Tr. C 113-14).

F.     **Testimony of Morales**

Morales testified that she had communicated with the executive assistant to the

Warden of the Northeast Regional Correctional Center. (Tr. C 139). The assistant informed her

that inmates are required to execute an acknowledgement of receipt of a copy of the inmate

handbook for the facility and provided Morales with a copy of one of the acknowledgments that

had been signed by Simmons. (Tr. C 140; G. Ex. 30).

Morales testified that she was one of the lead agents responsible for the

investigation of Simmons. (Tr. C 138). Morales testified that in October or November 2012 she

participated in the delivery of "target letters" to approximately ten individuals advising the

recipient that he or she was a target of a federal investigation. (Tr. C 143). According to

Morales, the letters were delivered to co-conspirators who were likely to have information

relating to the investigation. (Tr. C 143).

Approximately two months later, Morales and Investigator Hooper encountered

Simmons in the parking lot of the Civic Center Garage. (Tr. C 144). Morales testified that

although the area of the garage was accessible to the public, the area was primarily used by law

enforcement officers. (Tr. C 144, 207). Morales was surprised to see Simmons in that area.

(Tr. C 144-45). Morales asked Simmons why he was in that area of the parking garage and

whether he had a court appearance scheduled that day. (Tr. C 146-47). Simmons responded by

telling Morales to check his court records. (Tr. C 147). Morales asked Simmons whether he was

selling drugs in the basement, and Simmons replied that he does not sell drugs. (Tr. C 147).

According to Morales, a report prepared by Hooper also indicated that Simmons said that he knew that they were watching him and that he was watching them.  (Tr. C 150).  Morales testified that she believed that Simmons knew about the target letters that had been delivered.  (Tr. C 206).  Morales testified that this encounter concerned her because of her knowledge of the investigation, which involved a homicide in October 2012 and a separate violent act of suspected witness retaliation.  (Tr. C 149).

Approximately one week later, Morales participated in the arrest of Simmons and the execution of the search warrant at 480 Ravenwood Avenue, the home of Simmons's girlfriend.  (Tr. C 150).  During the execution of the warrant, a piece of paper with names on it was discovered in a cupboard inside the premises.  (Tr. C 151-52; G. Exs. 2 and 2A).  The paper included Morales's and Hooper's names, as well as the name of the Assistant United States Attorney prosecuting this case.  (Tr. C 152).  Although Morales was familiar with Simmons's handwriting, she did not recognize the handwriting on the list.  (Tr. C 154).  Morales testified that the list of names concerned her because it included the names of law enforcement personnel involved in the investigation of Simmons and because she was aware of Simmons's history of retaliation.  (Tr. C 153, 210).  Based upon these concerns, Morales contacted the jails where Simmons was incarcerated and requested recordings of his telephone calls.  (Tr. C 154-55, 211).

In response to her request, Morales was provided a disc containing phone calls recorded while Simmons was incarcerated at the Seneca County Jail and the Livingston County Jail.  (Tr. C 156-58).  Morales, who is familiar with Simmons's voice, testified that Simmons was a participant in each of the phone calls contained on the disc.  (Tr. C 157).  Morales summarized the substance of the calls.  (Tr. C 163).

According to Morales, on February 11, 2013 at approximately 7:00 p.m., Simmons spoke to Devin Allen-Furtick, a former co-defendant and an alleged co-conspirator of Simmons, who has pled guilty to possessing crack cocaine.  (Tr. C 163, 166, 170).  Simmons asked Allen-Furtick whether he had seen a "light-skinned dude" or the "tall nigga with the dreads."  (Tr. C 166).  According to Morales, she believed that these descriptions referred to two individuals who Simmons believed were cooperating against him.  (Tr. C 166-67).  Allen-Furtick responded that he had been looking for the two individuals, and Simmons stated that he would send him a "scribe" (a letter).  (Tr. C 167).  Morales believed that Simmons was directing Allen-Furtick to look for the two suspected cooperators and possibly to harm them.  (Tr. C 167).

A few days later, on February 16, 2013, Simmons again spoke with Allen-Furtick.  (Tr. C 169-70).  During the discussion, Simmons directed Allen-Furtick to look for an individual he referred to as "Son," who lived on the west side of Rochester.  (Tr. C 170).  Based upon her knowledge of the investigation, Morales believed that "Son" referred to Rashad Monson, whom Simmons is charged with shooting on June 5, 2012.  (Tr. C 171).  According to Morales, she believed that Simmons was directing Allen-Furtick to look for Monson and possibly to kill him.  (*Id.*).  Simmons also told Allen-Furtick that he was going to give his mother a letter to give to Allen-Furtick.  (Tr. C 172).  Simmons directed Allen-Furtick to follow the instructions in the letter.  (Tr. C 172).

Approximately thirty minutes later, Simmons spoke with Shakita Hill.  (Tr. C 172).  Simmons instructed her to obtain a paper from his mother and deliver the paper to another individual.  (Tr. C 173).  Simmons stated, "That bitch just needs to fall over and die … Word … that bitch needs to just fall over and die … like just fall and just die."  (Tr. C 173-75; G. Ex.

26

3A1).  Based upon the entirety of the conversation, Morales believed that Simmons was using the term "bitch" to refer to her.  (Tr. C 175-76, 214-15).

The following day, on February 17, 2013, Simmons again spoke with Shakita Hill.  (Tr. C 176-77).  Simmons described a dream that he had involving the "bitch Jennifer" and stated that he would "whoop that bitch if he catches her."  (Tr. C 177).  Morales testified that she believed this conversation was also about her.  (*Id.*).  Later that day, Simmons spoke with Tasha Becoats ("Becoats"), the mother of two of his children.  (Tr. C 177).  He instructed Becoats to obtain a piece of paper in order to write down information, including the names of investigators and judges.  (Tr. C 177-78).  Simmons indicated that he wanted Becoats to provide the list to "Black's mom."  (Tr. C 178).  Approximately one hour later, Simmons spoke to his mother and told her that he wanted her to write a list of names but, considering the number of names, he would provide the list during a subsequent conversation.  (Tr. C 178-79).

The following evening, Simmons called his mother and dictated a list of names.  (Tr. C 179).  During his dictation, Simmons paused and instructed his mother to put the words "investigators, judges and D.A." next to the names he had already provided.  (Tr. C 179).  He then provided some additional names, and the call ended.  (Tr. C 179).  According to Morales, the first set of names that Simmons provided to his mother included: David Swain, Andy Rodriguez, Kelly Christine Wolford, Victoria Argento, Joseph Briganti, Sandra Doorley, Matthew Schwartz, Douglas Randall, Murry Hooper, Jennifer Morales, James Tantino, Marian Payson, and James Schmitz.  (Tr. C 179).  The subsequent set of names included: Timothy Flowers, Vincent Phillips, Tina McDonald, Joanne Pierce, Rashad Monson, and Frank Brock, Senior.  (Tr. C 180).  According to Morales, with the exception of Monson, the names in the

second set were co-conspirators or others believed to have been engaged in drug trafficking activities.  (Tr. C 180).

A few minutes later, Simmons called his mother again, dictated several additional names, and told his mother to write "co-defendants and CW's" next to those names.  (Tr. C 180-81).  Later that same evening, Simmons spoke to Shakita Hill and told her that his mother had written down a list of names for him and instructed Shakita Hill to go to an address in order to attempt to get "Black's mother's number."  (Tr. C 181).  He also told her to go see "Danny" and to give him the names and explain the situation.  (Tr. C 181-82).  He told Hill to tell Danny that "it's for the buddy with the gold teeth who comes in there and gets his beads blessed," but that she should first attempt to "see what's up with Black's mom," and then go to Danny "because he doesn't have any other options."  (Tr. C 182).  Morales testified that "Danny" was a store owner who practices Santeria.  (Tr. C 216).

During a subsequent phone call to Shakita Hill, Simmons asked her if she had gotten the "stuff" from his mother; Hill explained that she had not.  (Tr. C 183).  Hill told Simmons to tell his mother to bring it to work and that she would pick it up in the morning. (Tr. C 183).  Simmons next spoke to his mother and told her to bring the paper to Hill.  (Tr. C 183).  He then spoke to Allen-Furtick and told him that he wanted him to speak with "Nicky" and that he could get her number from Shakita Hill.  (Tr. C 183-84).  According to Morales, Nicky was an individual involved in selling narcotics, and Simmons was instructing Allen-Furtick to speak with Nicky in order to continue narcotics trafficking activities.  (Tr. C 184-85).  Morales testified that Simmons also asked Allen-Furtick whether he had seen two individuals.  (Tr. C 185).

28

Based upon these telephone calls, Morales applied for and obtained a warrant to search Shakita Hill's residence at 480 Ravenwood Avenue. (Tr. C 187). During the execution of the warrant, a list of names was seized. (Tr. C 187; G. Ex. 4A). According to Morales, although some names were misspelled, she believed that the list of names included David Swain, Kelly Wolford, Joseph Briganti, Victoria Argento, Sandra Doorley, Jennifer Morales, Murry Hooper, Matt Schwartz, Douglas Randall, Andy Rodriguez, James Schmitz, Marian Payson, Timothy Flowers, Vincent Phillips, Tina McDonald, Schmillion Weaver, Joanne Pierce, Ciarra Crane, Frank Brock, Senior, Shakenia Smith, Rashad Monson, and Marquis McMillian. (Tr. C 188-89).

Based upon the telephone calls, Morales also decided to try to obtain copies of Simmons's correspondence from the facility in which he was incarcerated. (Tr. C 189). Seneca County Jail officials informed Morales that they had two letters belonging to Simmons in their possession. (Tr. C 190). Morales obtained a warrant for the letters. (Tr. C 190-91; G. Ex. 5). Morales testified that she recognized Simmons's handwriting. (Tr. C 217). One of the letters inquired whether the recipient had provided information regarding Simmons to the police and offered to provide the recipient information that could be provided to the police in lieu of information relating to Simmons. (Tr. C 192).

Morales testified that Simmons was subsequently transferred to Northeast Ohio Correctional Center and Yates County Jail. (Tr. C 194-95). Morales contacted officials at those facilities to request Simmons's correspondence and phone calls. (*Id.*). In October 2014, Morales was provided copies of letters believed to have been written by Simmons. (Tr. C 196, 217). One of the documents contained a list of names, some of which had appeared on the list seized from 480 Ravenwood and some of which had not. (Tr. C 197; G. Ex. 8). Morales testified that the

contents of the letters concerned Simmons's whereabouts on the evening of October 31, 2012 when Ryan Adams was shot.  (Tr. C 198-200).  Simmons has been charged with the murder in connection with that shooting.

## IV.    Affidavit of Dean Bekridakis

In support of its opposition to Simmons's motion to suppress the fruits of the June 8, 2012 traffic stop, the government submitted the affidavit of Dean Bekridakis ("Bekridakis"), an employee of SNORAC, LLC, the owner of the 2012 black Nissan Murano rental vehicle that was occupied by Simmons during the June 8, 2012 encounter.  (Docket # 434-1 at ¶¶ 1-2).  According to Bekridakis, the rental vehicle was rented by an individual named Alex Mouzon ("Mouzon").  (*Id.* at ¶ 4).  Bekridakis stated that the terms of the rental vehicle provided that only Mouzon and her spouse or domestic partner were authorized to drive the vehicle.  (*Id.* at ¶¶ 2-5).  Additionally, Bekridakis affirmed that unless Simmons was Mouzon's spouse or domestic partner, Mouzon would have violated the terms of the rental agreement by giving Simmons permission to drive the rental vehicle.  (*Id.* at ¶ 5).

## V.    Affidavits of Simmons

Simmons submitted several affidavits in support of his motions.  According to Simmons, on July 12, 2012 he was arrested by RPD officers at 112 Durnan Street.  (Docket # 400-1 at ¶ 3).  Simmons contends that he made statements to the officers while in custody in response to their questions and that he was not provided *Miranda* warnings.  (*Id.*).  Simmons also states that he was not engaged in unlawful conduct prior to his encounters with the police on

June 8, 19, and 28, 2012, and he maintains that the police officers had no lawful basis to detain him.  (*Id.* at ¶ 4).

With respect to the February 12, 2013 encounter, Simmons maintains that he recalled making a statement to himself immediately after a court appearance that day.  (Docket # 410 at ¶ 5).  Simmons maintains that his statement was in response to statements made by the prosecutor during the court proceeding.  (*Id.* at ¶ 6).

With respect to the recorded inmate telephone calls, Simmons states that he could not recall ever receiving, reviewing, or signing any notice indicating that telephone calls would be monitored or recorded.  (Docket # 419 at ¶ 2).  Simmons also states that he does not recall seeing any notices advising that phone calls would be monitored or recorded.  (*Id.* at ¶ 3).  Simmons also states that he never received any notice that any of his telephone calls would be recorded for use in connection with this or any other case.  (*Id.* at ¶ 4).

With respect to inmate correspondence, Simmons recalls being shown a copy of an order that "supposedly" permitted facility authorities at Seneca County Jail to monitor outgoing and possibly incoming mail.  (*Id.* at ¶ 6).  Simmons states that he did not see similar orders at any other facilities in which he was incarcerated after his arrest in this case.  (*Id.*).  Simmons also states that he does not recall receiving, reviewing, or signing any notice concerning the monitoring of inmate correspondence while he was incarcerated, with the possible exception of a document that he might have signed at Northeast Ohio detention facility.  (*Id.*).  Simmons maintains that he never knowingly consented to the monitoring or recording of either his telephone calls or his correspondence.  (*Id.* at ¶ 7).

## DECISION & ORDER

### I.      Bill of Particulars

I turn first to Simmons's motion for a bill of particulars.  (Docket ## 277 at ¶¶ 111-26; 401 at ¶¶ 15-18).  Simmons sought additional particularization with respect to several counts in the indictment.  (*Id.*).  In response, the government answered some of Simmons's requests (Docket # 402 at 7) and opposed some of the additional particularization sought by Simmons.  (Docket ## 288 at 34-35; 402 at 7).  Since the filing of these motions, the government has voluntarily provided additional particularization with respect Count Two, and the parties continue to discuss whether the government will voluntarily provide additional particularization with respect to Counts Three and Five.  The parties have agreed to contact this Court in the event that they are unable to resolve their dispute regarding the particulars of those two counts.

Accordingly, the only unresolved dispute concerning Simmons's request for particularization that remains pending before the Court is Simmons's request for the details of the alleged firearm possessions charged in Count Two of the indictment.  (Docket # 277 at ¶ 125(a)).  The government opposes the motion on the grounds that Simmons sufficiently understands the charges and has access to substantial voluntary discovery and the criminal complaint with its supporting affidavit, making his request unnecessary.  (Docket # 288 at 35).

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (per curiam).  A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case.  *See, e.g.,*

*United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (citation omitted), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).  In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof.  *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994).  Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow.  *See*, *e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (district court abused discretion in denying a bill of particulars identifying victims in seven-year racketeering conspiracy; court noted that principles governing bills of particulars "must be applied with some care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise him of the specific acts of which he is accused.  *See United States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198.  In determining that question, the court may consider whether the information sought by the defendant has been made available in alternative forms, such as in discovery or prior court proceedings.  *See United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998);

*United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

Having reviewed Simmons's requests, the government's responses, the indictment, and the materials before the Court on this motion, I conclude that Simmons has been adequately advised of the nature of the charges against him and the nature of the government's case.  Count Two of the indictment charges that Simmons, McMillian, Brock, and McDonald possessed firearms between January 2006 and June 2012 in further of a drug trafficking crime. (Docket # 362 at 1-2).  Counts Four, Six and Ten of the indictment allege several discrete instances in which Simmons is alleged to have possessed or discharged a firearm.  Those counts identify the specific dates of the alleged possessions, and the government has identified the victims referenced in each count.  Additionally, the government has represented that the allegations contained in those counts are included within the possessions alleged in Count Two of the indictment.

On this record, which includes voluminous discovery, a detailed criminal complaint, and a detailed proffer by the government at Simmons's detention hearing, I find that Simmons has sufficient information to prepare his defense, to avoid unfair surprise, and to interpose a claim of double jeopardy, if appropriate, and that further particularization as to Count Two is not required.  *See United States v. Bortnovsky*, 820 F.2d at 574; *United States v. Ellis*, 2015 WL 4913233, *12 (N.D. Cal.) (denying motion for bill of particulars requesting the specifics of firearms charges; "[t]he facts alleged in the indictment, including the specific incidents when the firearms were allegedly used in furtherance of a crime of violence, as well as the police reports related to each incident and the search returns specifying which guns were recovered, are sufficient to put defendant on notice of the charges against them"), *supplemented*

34

*on other grounds*, 2015 WL 6551628 (N.D. Cal. 2015); *United States v. Calvente*, 2013 WL
4038952, *1 (S.D.N.Y. 2013) (denying request for additional particularization of 924(c) charge,
including "the dates, times, and locations that each defendant possessed firearms[,]" because
"[n]one of the requests for particularity are necessary for the [d]efendants to prepare for trial,
prevent surprise, or interpose a double jeopardy claim"); *United States v. Mason*, 2007 WL
541653, *4-5 (S.D.N.Y. 2007) (denying request for particulars including "the dates and places
that [defendant] possessed firearms, and the types of firearms he possessed"; "[t]he superseding
[i]ndictment reveals that this case is a generic narcotics conspiracy, wherein firearms were used
to further narcotics trafficking[,] . . . [and] defendants seek 'the very sorts of information with
respect to which courts routinely deny requests for particularization'") (quoting *Bortnovsky*, 820
F.2d at 474); *United States v. Muyet*, 945 F. Supp. 586, 601 (S.D.N.Y. 1996) (denying request
for particularization regarding the "dates and times he is alleged to have used or carried a firearm
in relation to the narcotics conspiracy" where "the [g]overnment explained that its witnesses will
testify that the defendants carried firearms in relation to their narcotics dealing, but they may not
be able to specify the dates on which the defendants carried firearms").  Accordingly, Simmons
request for a bill of particulars is denied.


## II.   <u>Disclosure of Electronic Surveillance</u>

Simmons argues that Rule 16(a)(1)(B)(i) of the Federal Rules of Criminal
Procedure obligates the government to produce communications by him, if any, collected by the
National Security Agency ("NSA") under any federal programs or laws.[8]  (Docket # 277 at
¶¶ 82-96).

---

[8] Simmons also requests disclosure of "electronic communications between members of the prosecution
team that are described by or fall within the scope of a Department of Justice ("DOJ") Memorandum dated March

The government opposes Simmons's motion on the grounds that NSA is not part of the prosecution team and any communications in NSA's custody are not subject to disclosure under either *Brady* or Rule 16.  (Docket # 288 at 23-30).  The government also maintains that Simmons's request lacks specificity and constitutes an impermissible fishing expedition.  (*Id.* at 31-33).  Finally, the government contends that Simmons has not demonstrated that he would be unable, through the exercise of due diligence, to obtain the information on his own.  (*Id.* at 33-34).

The government has represented that it has disclosed any electronic communications intercepted or recorded in connection with this investigation that are in its possession.  (*Id.* at 24-25).  Additionally, the government has represented that NSA was not involved in the investigation or prosecution of this case and did not provide any of the evidence used in connection with the investigation.  (*Id.* at 25, 31).  Having reviewed the submissions, I agree with the government that even if NSA were in possession of electronic communications of Simmons – a wholly speculative assertion – those communications are not subject to production in this case under Rule 16.  *See United States v. McDavid*, 2007 WL 926664, *1, 3 (E.D. Ca. 2007) (denying defendant's request for "electronic communications information and material" including "material obtained through warrantless surveillance conducted by government agencies, including NSA" on the grounds that defendant failed "to make a preliminary showing that the prosecutor in this case has knowledge of or access to any results of NSA surveillance or data mining or that the NSA is part of the 'prosecution team'"); *United States v. Waters*, 2006 WL 3761338, *1-2 (W.D. Wa. 2006) (denying request for production of surveillance data and material where government had disclosed all electronic surveillance conducted or compiled as

30, 2011."  (Docket # 277 at ¶ 97).  The memorandum to which Simmons refers concerns the DOJ's policy regarding the retention of electronic information.  Nothing in the memorandum expands the government's disclosure obligations pursuant to Rule 16 of the Federal Rules of Criminal Procedure and applicable caselaw.

part of the investigation of the defendant); *United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) (denying defendant's Rule 16 request for materials in the possession of other federal agencies on the grounds that they were not in the possession of the prosecutors; "the prosecution must disclose documents material to the defense (1) that it has actually reviewed, or (2) that are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the 'prosecution team'"); *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) ("[c]ourts have construed the term 'government' in [Rule 16] narrowly to mean the prosecutors in the particular case or the governmental agencies jointly involved in the prosecution of the defendant, and not the 'government' in general") (collecting cases); *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) ("[t]he key to the analysis . . . is the level of involvement between the United States Attorney's Office and the other agencies"); *see also United States v. Alexander*, No. 11-CR-00148 at 3 (N.D. Ill. 2013) (denying Rule 16 request for "electronic surveillance materials purportedly in the possession of the NSA"; "[e]ven assuming *arguendo* that the NSA possesses the recordings and metadata [defendant] seeks, [defendant's] motion fails because he has not shown – or even suggested – that the NSA had any involvement in the investigation or prosecution of this . . . case or provided any evidence to the government in connection with this case").

## REPORT & RECOMMENDATION

### I.   Suppression of Statements

Simmons argues that his statements made in the presence of Morales and Ince on February 7, 2013 at 480 Ravenwood and on February 12, 2013 in the presence of Schmitz should

be suppressed on the grounds that he was in custody, not properly advised of his *Miranda* rights, and was subjected to the functional equivalent of interrogation. (Docket # 437 at 2-4). With respect to the February 12, 2013 statements, Simmons stated that he made the statement to himself while being escorted to the holding area by the marshals after a court appearance. (Docket # 410 at ¶ 5). According to Simmons, he made the statement in response to statements and accusations made by the government in support of its motion for detention. (*Id.* at ¶ 6). The government opposes the motion. (Docket # 442 at 1-2).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. Accordingly, "[e]ven absent the accused's invocation of [his rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012). To establish a valid waiver, the government must prove by a preponderance of the evidence that (1) the waiver was "knowing" – namely, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

38

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131 S. Ct. 969 (2011). Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary. *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 562 U.S. 1156 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

Of course, not every statement made to a police officer by an individual who is in custody is necessarily the product of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). For example, statements made spontaneously by a defendant are generally exempted from the *Miranda* requirements because they are not the result of deliberate elicitation by the officers. *See Rhode Island v. Innis*, 446 U.S. at 299-300. As the Supreme Court has explained:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

39

*Miranda*, 384 U.S. at 478; *see also Innis*, 446 U.S. at 299-300.  In other words, unsolicited statements made by a person voluntarily and freely will generally be admissible, irrespective of whether *Miranda* warnings were administered.  *See Innis*, 446 U.S. at 299-300; *see United States v. Lightbourn*, 357 F. App'x 259, 265 (11th Cir. 2009), *cert. denied*, 560 U.S. 917 (2010).

I find that the challenged statements were not the product of interrogation or its functional equivalent.  With respect to the February 7, 2013 statements, the testimony demonstrates that they were made by Simmons during the execution of the search warrant at 480 Ravenwood while he was handcuffed and seated on the stairs.  With the exception of one statement, the testimony demonstrated that none of Simmons's statements were prompted by police questioning or other conduct on the part of the officers.  The remaining statement was made after Morales provided instructions to other officers to ensure that a particular vehicle was towed from the premises.  I easily conclude that Morales's instruction, made in the course of executing the search warrant, was not reasonably likely to illicit an incriminating statement from Simmons.  *See United States v. Jones*, 2013 WL 4541042, *8 (W.D.N.Y. 2013) (finding defendant's statement spontaneous despite officer's discussion of discovery of firearm; "[t]his was an exchange between law enforcement officers that is to be expected during the execution of a search warrant and was neither evocative nor a psychological ploy designed to induce [the defendant] to make a statement of any kind").

I reach a similar conclusion with respect to Simmons's statement made on February 12, 2013 during an escort after an appearance before this Court.  The testimony demonstrates that none of the officers escorting Simmons made any comments or engaged in any conduct designed to elicit an incriminating response from Simmons.  Rather, as Simmons's affidavit demonstrates, the statement was spontaneously uttered, apparently to himself, after

hearing the government's detention proffer.  On this record, I find that Simmons's February 7

and 12, 2013 statements were voluntary and spontaneous utterances that do not warrant

suppression.


## II.   Encounters with Simmons

Simmons maintains that information, evidence or statements obtained or seized

during several encounters between himself and various RPD officers should be suppressed on the

grounds that he was unlawfully detained during the encounters.  (Docket # 437 at 5-7).

### A.   June 8, 2012 Traffic Stop

Simmons seeks to suppress evidence of the fact that he and McMillian were

together in a car on July 8, 2012 and the information from the notebook that Coniglio observed

during the search of the car.  (Docket # 437 at 5).  The basis for Simmons's suppression motion

is far from clear.  To the extent that he contends that the officers lacked reasonable suspicion to

detain him or probable cause to search the vehicle, I disagree.

First, I easily conclude that the smell of burnt marijuana emanating from the

vehicle provided the officers with reasonable suspicion to investigate, as well as probable cause

to search the vehicle.  According to the Second Circuit, an ordinary traffic stop constitutes a

limited seizure within the meaning of the Fourth Amendment.  *United States v. Scopo*, 19 F.3d

777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S.

877 (1994).  A traffic stop "must be justified by probable cause or reasonable suspicion, based on

specific and articulable facts, of unlawful conduct."  *Id.* (quoting *United States v. Hassan El*, 5

F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see Terry v. Ohio*, 392 U.S.

1, 30 (1968) (police officer may lawfully conduct brief stop if officer "observes unusual conduct

which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence obtained as the result of an unjustified traffic stop "'is subject to the fruit of the poisonous tree doctrine' and may be suppressed." *United States v. Scopo*, 19 F.3d at 781 (citing *United States v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

On a motion to suppress, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure.  *See United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996).  The burden then shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment.  *United States v. Bayless*, 921 F. Supp. at 213 (citing *United States v. Arboleda*, 633 F.2d at 989); *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

In this case, Coniglio testified that while on patrol on Reynolds Street he passed a stationary Nissan Murano and smelled the "overpowering" scent of burning marijuana coming from the car.  (Tr. A 25-26).  Based on the smell, Coniglio approached the Murano to investigate. (*Id.*).  He then identified Simmons and McMillian as the occupants of the vehicle, frisked them, and secured them in patrol vehicles, while he searched the Murano.  (Tr. A 28-29, 37-38).

I find that the investigation and detention of Simmons was lawful.  Coniglio's observations provided reasonable suspicion to believe that the occupants of the vehicle possessed marijuana, justifying the investigative detention of the occupants.  *See United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause[;] . . . [r]ecognizing this, defendants concede that, had an officer smelled marijuana coming directly from their car, not only reasonable suspicion, but probable cause would have been established, justifying the stop"); *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999) (reasonable suspicion of criminal activity justifying investigative detention existed based upon smell of PCP emanating from defendant's bag), *cert. denied*, 531 U.S. 830 (2000).  Additionally, the smell of marijuana emanating from the Murano provided Coniglio with probable cause to search the vehicle for marijuana.  *United States v. Wiggins*, 2013 WL 1645180, *12 (W.D.N.Y.) (smell of marijuana emanating from vehicle provided probable cause to search vehicle for marijuana), *report and recommendation adopted*, 2013 WL 2553971 (W.D.N.Y. 2013).

To the extent Simmons challenges Coniglio's observation and recording of the contents of one page of the notebook, such challenge is similarly unavailing.  As an initial matter, it is not clear that Simmons has standing to challenge the search of the rental vehicle.[9] *See United States v. Van Praagh*, 2014 WL 4954162, *3 & n.5-6 (S.D.N.Y. 2014) ("[t]hough the Second Circuit does not appear to have addressed this issue, the Third, Fourth, Fifth, Tenth and Sixth Circuits have held that a defendant who is not an authorized driver under the rental agreement generally lacks a legitimate privacy interest in the vehicle[;] . . . [i]n contrast, the

---

[9]  Simmons did not submit an affidavit in response to Bekridakis's affidavit submitted by the government. During oral argument on the motions, the government conceded, for the purposes of this motion, that Simmons had the renter's permission to drive the rental vehicle, and the defense conceded, for the purposes of the motion, that Simmons was not the individual who rented the vehicle from the owner.  (Docket # 432 at 7-8).

Eighth and Ninth Circuits have held that 'an unauthorized driver who received permission to use

a rental car ... may challenge the search to the same extent as the authorized renter'") (collecting

cases and quoting *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006)); *United States*

*v. Mikelic*, 2011 WL 1837844, *4 (D. Conn. 2011) ("[defendant's] name was not on the rental

agreement nor was [defendant] an authorized driver of the rental vehicle[;] . . . [t]herefore,

[defendant] does not have a reasonable expectation of privacy in the rental car and, thus, does not

have standing to challenge the search of the car itself"); *United States v. Taddeo*, 724 F. Supp.

81, 84-85 (W.D.N.Y. 1989) (holding that "a defendant in sole possession and control of an

automobile rented by a third party who voluntarily lent him the car" has no standing to challenge

the search of the vehicle), *aff'd*, 932 F.2d 956 (2d Cir. 1991).

　　　　　In any event, the record establishes that Coniglio unfolded the notebook to

determine whether marijuana was concealed inside it – a lawful act that was within the scope of

the search authorized by the smell of marijuana emanating from the vehicle.  *See United States v.*

*Wiggins*, 2013 WL 1645180 at *12 ("[i]f an officer has probable cause to believe that a vehicle

contains contraband, the permissible scope of the search extends anywhere within the vehicle

that the contraband may be located, including containers or packages").  Upon unfolding the

notebook, the written notations of vehicle descriptions and license plate numbers were visible in

plain view without any additional search or manipulation of the notebook by Coniglio.

Coniglio's act of recording the visible information did not constitute a seizure within the

meaning of the Fourth Amendment.  *See Arizona v. Hicks*, 480 U.S. 321, 324 (1987) ("mere

recording of the serial numbers did not constitute a seizure" because it did not "'meaningfully

interfere' with respondent's possessory interest in either the serial numbers or the equipment, and

therefore did not amount to a seizure"); *United States v. Mancari*, 463 F.3d 590, 596 (7th Cir.

2006) (photographing currency that was not within the scope of the warrant did not constitute an unreasonable seizure because "the recording of visual images of a scene by means of photography does not amount to a seizure because it does not 'meaningfully interfere' with any possessory interest[;] . . . [t]he government was therefore entitled to make a photographic record of the discovery of the money in a place that the police were lawfully entitled to observe") (quoting *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992)); *United States v. Taylor*, 683 F.2d 18, 21 (1st Cir.) ("[o]nce lost by this plain view exposure, the concept of privacy cannot be revived to prevent copying[;] [t]he police undertook no impermissible seizure by making a copy, leaving the negative, and defendants' copies undisturbed"), *cert. denied*, 459 U.S. 945 (1982); *United States v. Long*, 2005 WL 2807123, *8 (W.D. Pa. 2005) ("investigating the serial numbers on weapons which have come lawfully into the possession of investigators does not constitute a search or seizure in violation of the Fourth Amendment").  Accordingly, I recommend denial of Simmons's motion to suppress evidence derived from the June 8, 2012 traffic stop.

**B.     June 28, 2012 Traffic Stops**

The testimony established that a vehicle driven by Simmons was stopped by RPD officers on two separate occasions on June 28, 2012.  Simmons maintains that both traffic stops were unlawful and that any information obtained as a result of the stops, including any statements made or the fact that Simmons and Brock, Jr. were traveling in the same vehicle, should be suppressed.[10]  I disagree based upon my conclusion that reasonable suspicion existed to justify both traffic stops.

---

[10] In response to Richardson's questioning, Simmons indicated that he had been smoking marijuana. (Tr. B 31).  Although Simmons's submissions seek suppression of this statement on the grounds that the stop of the vehicle was unlawful, they do not, as I interpret them, seek suppression of the statement on the grounds that it was obtained in violation of *Miranda* or was otherwise involuntary.  In any event, I conclude that Simmons was not in custody at the time Richardson questioned him concerning marijuana and that reasonable suspicion to question Simmons about marijuana existed at the time of the questioning.  *See Wiggins*, 2013 WL 1645180 at *5-6.

In this case, Richardson testified that while on patrol on Bartlett Street he passed a stationary vehicle and detected the smell of burning marijuana coming from the car.  (Tr. B 28-29).  The smell of marijuana caused Richardson to approach the vehicle to investigate.  (*Id.*).  Richardson identified Simmons as the driver, and Brock, Jr. as the passenger, and asked Simmons whether he had been smoking marijuana.  (Tr. B 31, 33).

Ince testified that while he was on patrol in the City of Rochester he observed a vehicle fail to provide sufficient notice before turning at an intersection in violation of New York Vehicle and Traffic Law Section 1163(b).  (Tr. A 62-63).  Ince pulled the vehicle over and identified Simmons and Brock, Jr. as the occupants.  (Tr. A 64-65).

Based on the circumstances of these encounters, I find that both traffic stops were lawful.  Richardson's observations provided reasonable suspicion to believe that the occupants of the vehicle possessed marijuana, and Ince's observations provided probable cause to believe that the driver of the Tahoe had violated New York's Vehicle and Traffic Law.  *See, e.g., Wren v. United States*, 517 U.S. 806, 810 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) ("reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop"); *United States v. Ramos*, 443 F.3d at 308 ("[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause[;] . . . [r]ecognizing this, defendants concede that, had an officer smelled marijuana coming directly from their car, not only reasonable suspicion, but probable cause would have been established, justifying the stop"); *United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir.) ("because the officers had a reasonable but mistaken belief that the SUV lacked license

plates, stopping the vehicle was 'justified at its inception'"), *cert. denied*, 549 U.S. 1008 (2006);

*Scopo*, 19 F.3d at 782 ("[w]hen an officer observes a traffic offense – however minor – he has

probable cause to stop the driver of the vehicle") (internal quotation omitted); *United States v.*

*Hill*, 199 F.3d at 1148 (reasonable suspicion of criminal activity justifying investigative

detention existed based upon smell of PCP emanating from defendant's bag).   Accordingly, I

find that both traffic stops were lawful.

C.   <u>July 12, 2012 Encounter</u>[11]

Simmons seeks to suppress evidence seized and statements he made during an

encounter with RPD officers that led to his arrest on July 12, 2012.   (Docket # 437 at 6-7).   The

testimony established that Thomas and his partner were in the area of 112 Durnan Street on July

12, 2012 looking for a suspect.   (Tr. B 10-11, 14).   As Thomas exited his vehicle, he noticed a

strong smell of burning marijuana and observed Simmons on the front porch of 112 Durnan

holding what appeared to be a lit marijuana cigar.   (Tr. B 12-13).   As the officers approached the

residence, Simmons threw the cigar, and Thomas observed a baggie of suspected marijuana fall

from Simmons's person.   (Tr. B 13, 16).   Without being asked any questions by the officers,

Simmons stated that he was smoking marijuana.[12]   (Tr. B 13).   Nothing in the record suggests

that the officers entered the property at 112 Durnan Street.   Further, the smell of marijuana and

Thomas's observations provided an adequate justification to investigate whether Simmons

---

[11]   The Court also heard testimony concerning an encounter between Simmons and RPD officers on June 19, 2012.   As the government correctly notes, Simmons has not addressed this encounter in his post-hearing submission, and the Court is unable to discern what, if any, information Simmons seeks to suppress.   In any event, I conclude that the RPD officers were lawfully outside the premises at 112 Durnan Street on June 19, 2012 to investigate a report of individuals smoking marijuana.   (Tr. B 19, 21).   Nothing in the record suggests that the officers entered the property, and I conclude that the officers were justified in investigating the complaint, including identifying those individuals who were present.

[12]   Simmons's post-hearing submission does not argue that this statement should be suppressed on the grounds that it was involuntary or obtained in violation of *Miranda;* rather, it seeks suppression as fruit of an unlawful detention.   In any event, the testimony establishes that the statement was spontaneous and that Simmons was not in custody at the time the statement was made.

possessed marijuana.  *See Wiggins*, 2013 WL 1645180 at *5-6 (smell of marijuana provided reasonable suspicion to investigate for the presence of marijuana).

### III.     Suppression of Identification Testimony

Simmons has moved to suppress evidence of the three photographic identifications.[13]  (Docket # 437 at 20-21).  The government opposes the motion, contending that none of the procedures were unduly suggestive.  (Docket # 442 at 24).

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive.  *Id.*  To decide whether a photographic array is unduly suggestive, a court should consider several factors including "the size of the array, the manner of presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must consider "whether the picture of the accused . . . so stood out from all of the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit."  *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations and quotations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability."

---

[13]   Simmons reserved his right to supplement his motion after receiving better quality copies of the arrays used during the procedures.  (Docket # 437 at 21).  Those copies were attached to an email from counsel for the government to counsel for Simmons on September 3, 2015.  Simmons' counsel indicated that the copies attached to the email were sufficient.  Simmons has not supplemented his submission.

*United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98,

109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or

impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in

the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v.*

*Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*,

923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862

(1994).

                At the government's request, this Court bifurcated the *Wade* hearing.  To date, the

government has offered evidence relating only to the issue of the suggestiveness of the

procedures.  Of course, no continuation of the hearing is necessary if the court determines that

the procedures were not unduly suggestive.  On the other hand, if the court finds that the

procedures were impermissibly suggestive, the hearing must be continued to determine whether

the identifications are independently reliable.

                On the record before the Court, I find that the identification procedures were not

impermissibly suggestive.  During both the September 11, 2012 and the January 16, 2013

identification procedures, both witnesses were presented several photographic arrays.  Prior to

the presentation of any of the arrays, the witnesses were instructed to view the arrays and to

indicate whether they could identify any of the individuals depicted and, if so, to record the

identification above the photograph.  The witnesses were then presented several arrays, one after

another.  During the January 23, 2013 identification procedure, the witness was instructed that

she may or may not recognize any individuals depicted in the array and, if she did, she should

record the identification on the array.

The arrays containing Simmons's photographs contain six photographs of different African American men from the neck to the top of their heads.  (G. Exs. 10, 11 and 12).  All of the men have moustaches, some have slight beards, and all appear to have closely cut or shaved hair.  (*Id.*).  The men all appear to be of a similar age.  (*Id.*).  There are a few minor differences of lighting and background between some of the photographs.  (*Id.*).  For instance, in all of the arrays, Simmons's face appears darker than the faces of four of the other men, apparently as a result of both the quality of the photograph and Simmons's complexion.  (*Id.*).  Simmons's face is similar in complexion to the remaining man depicted in the photographs.  (*Id.*).  In the arrays used in January, Simmons's photograph has a similar background hue to four of the other photographs, although two have noticeably browner backgrounds.  (G. Exs. 11 and 12).  In the September array, one of the photographs (not Simmons) has a darker background hue than the others.  (G. Ex. 10).  I find that these differences in color and shading do not draw the viewer's eye to Simmons's photograph and are not significant enough to "suggest to an identifying witness that [the defendant] was more likely to be the culprit," *Jarrett v. Headley*, 802 F.2d at 41.  *Compare United States v. Douglas*, 525 F.3d 225, 243 (2d Cir.) ("[a]s to the background colors of the photos, no two are the same, and no picture stands out because of its background color"), *cert. denied*, 555 U.S. 1033 (2008); *United States v. Bautista*, 23 F.3d at 731 ("[w]hile it is true that the photograph of [the defendant] is brighter and slightly more close-up from the others, we find that these differences did not render the array suggestive"); *United States v. Stanley*, 2009 WL 5066864, *6 (E.D.N.Y. 2009) ("the difference in background colors did not place undue focus on [the defendant] because the filler backgrounds were not all uniform either") *with United States v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) ("[the defendant's] photo stood out sharply from the others in the array [as a result of] . . . [t]he dark background and

lack of overhead lighting"), *cert. denied*, 552 U.S. 1157 (2008); *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir.) ("differences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eye to that picture"), *cert. denied*, 513 U.S. 1007 (1994); *United States v. Friedman*, 1996 WL 612456, *27 (E.D.N.Y. 1996) (array suggestive because "[w]hen [the defendant's] pale complexion and the background are viewed in conjunction, the effect is quite striking [, . . . making the defendant's] photograph stand[] out in both arrays in a manner that is extremely distinctive"), *aff'd in part and rev'd in part on other grounds*, 300 F.3d 111 (2d Cir. 2002), *cert. denied*, 538 U.S. 981 (2003).

Accordingly, I recommend that the district court deny Simmons's motion to suppress the three photographic identifications.

## IV.    **Suppression of Inmate Telephone Calls**

Simmons seeks suppression of recordings of telephone calls he made while he was incarcerated on the grounds that the calls were intercepted without a warrant in violation of Title III, 18 U.S.C. §§ 2510-22, and the First, Fourth, and Fifth Amendments.  (Docket # 437 at 7-20).  The government counters that the record demonstrates that Simmons was provided notice of calls and that he either expressly or impliedly consented to the recording of his telephone calls, defeating any claimed violation of Title III or the First, Fourth, or Fifth Amendments. (Docket # 442 at 11-16).

In general, in the absence of judicial authorization, Title III prohibits the intentional interception of telephone calls and admission at trial of any recordings of unlawfully intercepted telephone calls.  *United States v. Friedman*, 300 F.3d 111, 120 (2d Cir. 2002) (citing 18 U.S.C. §§ 2510-2522), *cert. denied*, 538 U.S. 981 (2003).  With respect to his constitutional

rights, Simmons retains "some residual privacy interests that are protected by the Fourth

Amendment," *see United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988), *cert. denied*, 488

U.S. 1033 (1989), as well as the "right to communicate with people outside the prison walls"

under the First Amendment, *see United States v. Colbert*, 2011 WL 3360112, *8 (W.D. Pa.

2011).  Nonetheless, "the maintenance of prison security and preservation of institutional order

and discipline are 'essential goals that may require limitation or retraction of the retained

constitutional rights of both convicted prisoners and pretrial detainees.'" *United States v.

Willoughby*, 860 F.2d at 21 (quoting *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)).

     Further, although inmates are "entitled to the protections afforded by Title III[,]

. . . no violation of Title III occurs where the inmate has consented to the interception." *United

States v. Anderson*, 2012 WL 3648189, *4 (W.D.N.Y.) (citing *United States v. Workman*, 80

F.3d 688, 692 (2d Cir.), *cert. denied*, 519 U.S. 938 (1996)), *report and recommendation adopted*,

2012 WL 3648142 (W.D.N.Y. 2012).  Such consent may be express or implied through evidence

that an inmate was notified that telephone calls were subject to monitoring or recording. *See

United States v. Workman*, 80 F.3d at 693 ("inmates impliedly consent to have their telephone

conversations monitored where they have received notice of the surveillance and nevertheless

use the prison telephones"); *Willoughby*, 860 F.2d at 19-20 ("[i]n the prison setting, when the

institution has advised inmates that their telephone calls will be monitored and has prominently

posted a notice[,] . . . the inmates' use of those telephones constitutes implied consent to the

monitoring within the meaning of Title III"); *United States v. Anderson*, 2012 WL 3648189 at *4

(automated messages and posted signs warning that telephone calls were subject to recording or

monitoring was "sufficient to support a finding that the inmate impliedly consented to having his

calls recorded").

The record establishes that each of the facilities in which Simmons was detained provided verbal notice to him through an automated message that his outgoing telephone calls were subject to monitoring and recording.  (Tr. C 10-11; G. Exs. 21 and 22 (Seneca County Jail));[14] (Tr. C 31 (Livingston County Jail)); (Tr. 40, 52 (Northeast Ohio Correctional Center)), (Tr. C 64 (Monroe County Jail)); (Tr. C 95-96 (Yates County Jail)).  Additionally, many of the facilities, including Livingston County Jail (Tr. C 31-34; G. Exs. 23 and 24), Northeast Ohio Correctional Center (Tr. C 41, 45-47; G. Ex. 25) and Monroe County Jail (Tr. C 62, 67), also provided written notice to Simmons that his telephone calls were subject to monitoring and/or recording.

I find that Simmons received clear notice at each of the facilities that his telephone calls could or would be monitored or recorded, and his decision to initiate telephone calls despite that notice establishes his implied consent to the recording and monitoring of his telephone calls.[15]  *See Workman*, 80 F.3d at 693 (implied consent where defendant was provided notice of monitoring through New York regulations, a sign placed near each telephone, and an orientation handbook); *Willoughby*, 860 F.2d at 20 (finding consent where defendant was provided notice of the monitoring and recording program through orientation lectures, signage

---

[14]  Simmons maintains that the record fails to establish the particular verbal notice provided to Simmons when he placed outgoing phone calls from Seneca County Jail.  (Docket # 437 at 19-20).  I disagree.  Borland testified that he transcribed the verbal notice contained on the system prior to June 2015.  (Tr. C 21-22).  Simmons was incarcerated at Seneca County Jail from February through May of 2013.  (Tr. C 15).  Although Borland did not know precisely when that notice was first used (Tr. C 23), or whether the notice was ever modified, the Court has listened to several of the calls intercepted during Simmons's incarceration at Seneca, including the first and the last calls, and each of those recorded calls contains the notice.

[15]  To the extent that Simmons seeks suppression of intercepted telephone calls that he received from other individuals who were incarcerated when he was not incarcerated, suppression would not be warranted to the extent that those individuals received similar notice of the monitoring or recording of their telephone calls.  *See Workman*, 80 F.3d at 694 ("'the interception of calls from inmates to noninmates does not violate the privacy rights of the noninmates'[;] . . . [o]nly a single participant in a conversation need agree to the monitoring in order to satisfy the requirements of the Fourth Amendment") (quoting *Willoughby*, 860 F.2d at 22).  If Simmons maintains that he was a recipient of intercepted phone calls made from facilities not discussed herein, it is incumbent upon Simmons to identify such phone calls, the dates of the calls, identities of the participants, and the facilities from which they originated.

posted by each telephone, and a form describing the policy and requiring a signature); *United States v. Amen*, 831 F.2d 373, 379 (2d Cir. 1987) (defendant impliedly consented where notice was provided through the Code of Federal Regulations, an orientation lecture, the inmate handbook, and notices placed next to the telephones), *cert. denied*, 485 U.S. 1021 (1988); *United States v. McAuley*, 2014 WL 7796696, *34-35 (W.D.N.Y. 2014) (finding implied consent where defendant was notified through an automated message played prior to each telephone call), *report and recommendation adopted*, 2015 WL 540738 (W.D.N.Y.), *aff'd*, 2015 WL 6445022 (2d Cir. 2015); *Anderson*, 2012 WL 3648189 at *4 (finding implied consent where defendant was provided notice through an automated message and a placard by each phone); *United States v. Laster*, 2007 WL 2872678, *3-4 (S.D.N.Y. 2007) (finding express and implied consent where defendant received notice through an acknowledgement form, orientation lecture, signage near the telephones, and the inmate handbook).  In sum, I conclude that the recording of Simmons's phone calls did not violate Title III or the First, Fourth, or Fifth Amendments.  *See Workman*, 80 F.3d at 693-94 (finding no violation of Title III or the Fourth Amendment); *Willoughby*, 860 F.2d at 20-21 (same); *United States v. Amen*, 831 F.2d at 379 (same); *Anderson*, 2012 WL 3648189 at *4 (same); *United States v. Laster*, 2007 WL 2872678 at *4-5 (finding no violation of Title III or the Fourth, Fifth and Sixth Amendments); *United States v. Colbert*, 2011 WL 3360112 at *8-9 (finding no violation of the First, Fourth, Fifth or Fourteenth Amendments). Accordingly, I recommend denial of Simmons's motion to suppress the inmate telephone calls.

## V.     Suppression of Inmate Correspondence

Simmons seeks to suppress correspondence obtained by prison officials and provided to law enforcement while he was incarcerated at various facilities, including Seneca

54

County Jail, Northeast Ohio Correctional Center, and Yates County Jail.  (Docket # 437 at 7-20).

Simmons maintains that the monitoring of his mail by prison officials at the request of law

enforcement and the production of copies of his correspondence to law enforcement violated his

constitutional rights.  (*Id.*).  Simmons's challenge is based upon his contention that the

correspondence was unlawfully intercepted for investigative purposes, rather than for legitimate

and lawful penological purposes.

      "[P]risoners do not forfeit all constitutional protections by reason of their . . .

confinement in prison[,]"; nevertheless, "it must be recognized that a prisoner's constitutional

rights are limited by the legitimate penological needs of the prison system."  *United States v.*

*Felipe*, 148 F.3d 101, 107 (2d Cir.) (quoting *Bell v. Wolfish*, 441 U.S. at 545), *cert. denied*, 525

U.S. 907 (1998); *see Jackson v. Portuondo*, 2007 WL 607342, *12 (N.D.N.Y. 2007) (inmates'

"rights are both circumscribed and subject to legitimate penological concerns of prison

officials").  "Consistent with these principles, prison inmates enjoy 'those First Amendment

rights that do not contravene prison regulations "reasonably related to legitimate penological

interests."'"  *Id.* (quoting *United States v. Felipe*, 148 F.3d at 108).

      The interception of inmate correspondence has been analyzed under both the First

and the Fourth Amendments, and the Second Circuit has held "that the interception of a

defendant's prison correspondence does not violate that individual's First or Fourth Amendment

rights if prison officials had a 'good' or 'reasonable' cause to inspect the mail."  *Felipe*, 148 F.3d

at 108.  "The investigation and prevention of ongoing illegal inmate activity constitute legitimate

penological objectives."  *Workman*, 80 F.3d at 699.  Similarly, there is no constitutional violation

where inmate correspondence is reviewed in order "to monitor an inmate's efforts to improperly

influence a trial or disciplinary proceeding against him." *Acevedo v. Fischer*, 2015 WL 7769486, *6 (S.D.N.Y. 2015).

The testimony established that Morales requested a mail watch for Simmons's mail based upon her knowledge of the investigation, which included allegations of witness intimidation through acts of violence and the discovery of a list of names of individuals related to the investigation (agents, prosecutors, judges, witnesses) at Simmons's girlfriend's residence, as well as her monitoring of Simmons's phone communications.  Those communications revealed that Simmons had dictated a list of names of individuals involved in his prosecution, including prosecutors, law enforcement officers, judges, co-defendants, and other witnesses.  Morales testified that, based upon her knowledge of the investigation as well as Simmons's history of retaliation and violence, she was concerned for the safety of the individuals included on that list. Morales also testified that the content of the telephone calls suggested that Simmons continued to be involved in narcotics activity while incarcerated and that he intended to communicate with an alleged co-conspirator through written correspondence.

Indeed, Bailey testified that similar concerns regarding a potential "hit list" he observed prompted him to forward a copy of Simmons's envelope and its contents to law enforcement.  (Tr. C 110-11).  Having reviewed Morales's testimony concerning the investigation and the content of intercepted telephone communications, I conclude that prison officials had "'good' or 'reasonable' cause to inspect [Simmons's] mail." *Felipe*, 148 F.3d at 108 (good cause existed where prison officials had knowledge that defendant was associated with a criminal enterprise and was actively recruiting new members); *see also Workman*, 80 F.3d at 699 (good cause to monitor defendant's mail based upon monitored telephone conversations that suggested that defendant continued to conduct narcotics transactions and discussed the

56

commission of contract murders while incarcerated); *Acevedo v. Fischer*, 2015 WL 7769486 at *6 (good cause to monitor inmate's mail where police detective investigating inmate in connection with three homicides requested mail watch based upon concern that inmate might attempt to threaten, intimidate or influence witness's testimony); *Gordon v. Bridge*, 2005 WL 1868799, *3 (W.D.N.Y. 2005) (good cause to inspect mail existed in order to prevent inmate from continuing to commit criminal behavior while incarcerated); *Butti v. Unger*, 2005 WL 1676739, *3 (S.D.N.Y. 2005) ("[t]he temporary surveillance of [inmate's] mail was based on a reasonable suspicion of his continuing criminal activity, and was reasonably related to legitimate penological interests").  Accordingly, I conclude that Simmons's motion to suppress evidence of intercepted inmate correspondence should be denied.


## CONCLUSION

For the reasons stated above, Simmons's motion for a bill of particulars **(Docket ## 277, 401)** and his request for disclosure of electronic surveillance **(Docket # 277)** are **DENIED**.  Further, for the reasons stated above, I recommend that the district court deny Simmons's motion to suppress statements, evidence, identification testimony, inmate telephone calls and inmate correspondence.  **(Docket ## 277, 304, 400, 401, 437)**.

**IT IS SO ORDERED.**


                                                    *s/Marian W. Payson*
                                                 MARIAN W. PAYSON
                                              United States Magistrate Judge


Dated: Rochester, New York
           January 22, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[16]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                      *s/Marian W. Payson*
                                   MARIAN W. PAYSON
                          United States Magistrate Judge

Dated:  Rochester, New York
        January 22, 2016

---

[16]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).